James E. Cecchi
CARELLA BYRNE CECCHI
OLSTEIN BRODY & AGNELLO, PC
5 Becker Farm Road
Roseland, NJ 07068-1739
(973) 994-1700

*Attorneys for Plaintiff and the Proposed Classes*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANTHONY HUGHES, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:17-cv-6588 |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| | <u>JURY TRIAL DEMANDED</u> |
| VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., BENTLEY MOTORS LIMITED, AUDI AG, AUDI OF AMERICA, LLC, DR. ING. H.C.F. PORSCHE AG, PORSCHE CARS NORTH AMERICA, INC., DAIMLER AG, MERCEDES-BENZ USA, MERCEDES-BENZ VANS, LLC, MERCEDES-BENZ U.S. INTERNATIONAL, INC., BAYERISCHE MOTOREN WERKE AG, BMW OF NORTH AMERICA, LLC, ROBERT BOSCH GMBH, and ROBERT BOSCH LLC, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF ACTION ...........................................................................................1

THE PARTIES.....................................................................................................4

     A.     Plaintiff .........................................................................................4

     B.     Defendants ....................................................................................4

     C.     Agents and Co-Conspirator Defendants ...................................7

JURISDICTION AND VENUE ...........................................................................8

FACTUAL ALLEGATIONS ..............................................................................10

     A.     Defendants Colluded to Limit Competition in the German Luxury Vehicle Market.............................................................10

     B.     Defendants Colluded in the Development of Emission Control Systems ...........................................................................11

     C.     Defendants Colluded to Stifle Other Technological Innovation...........................15

     D.     Defendants Targeted U.S. Customers in Their Sales and Marketing Touting the Superior Design and Technology of German Luxury Vehicles................................................16

     E.     Defendants Requested Permission from U.S. Regulators to Sell Vehicles...............................................................18

     F.     The Characteristics of the German Luxury Vehicle Market Enabled Collusion.............................................................20

     G.     Defendants' History of Illegal Activity and Collusion .........................21

TOLLING OF THE STATUTE OF LIMITATIONS.................................................24

CLASS ACTION ALLEGATIONS ....................................................................25

ANTITRUST INJURY .......................................................................................28

COUNTS.............................................................................................................30

DEMAND FOR JUDGMENT............................................................................35

JURY TRIAL DEMAND ...................................................................................36

Plaintiff Anthony Hughes, on behalf of himself and all others similarly situated, hereby alleges the following, based solely on personal knowledge, information and belief, the investigation of counsel, expert analysis, and public sources, including, among other things, a report entitled "*The Cartel: Collusion Between Germany's Biggest Carmakers*" published by *Der Spiegel* on July 27, 2017, detailing collusion by German automobile manufacturers (the "*Der Spiegel* Report").  Plaintiff's investigation is ongoing and details of the cartel described herein continue to be revealed, despite the participants' efforts to keep them confidential. Prosecutors in the European Union, including Germany, and the United States are investigating as well.  For these reasons, Plaintiff specifically reserves the right to amend and to add additional facts, claims, parties, and co-conspirators.  Plaintiff brings this class action for damages and injunctive relief, and other relief pursuant to the federal antitrust law and state antitrust, consumer protection, and common law.

## NATURE OF ACTION

1.      This lawsuit arises out of a twenty-year conspiracy by the largest and most recognizable German automobile manufacturers to unlawfully collude in the development, production, and sale of luxury automobiles.  Specifically, Volkswagen AG, Audi AG, Dr. Ing. h.c.F. Porsche AG, Daimler AG, Bayerische Motoren Werke AG, and their respective affiliates (collectively, the "Manufacturer Defendants") engaged in a vast conspiracy to minimize competition, while promoting a public perception of competition and superior German

engineering to maintain the premium prices charged to their customers for German Luxury Vehicles.[1]

2.    As part of the conspiracy, the Manufacturer Defendants agreed to source materials from only certain suppliers.  Other, non-cartel-approved suppliers were effectively barred from working with any of the Manufacturer Defendants.

3.    Robert Bosch GmbH and its affiliates, important suppliers of automotive parts to the Manufacturer Defendants, played a central role in furthering and concealing the Manufacturer Defendants' conspiracy.

4.    Among other things, the Manufacturer Defendants negotiated secret agreements among themselves to share proprietary information and reach unlawful agreements regarding technology, production, costs, emissions equipment, suppliers, and other competitive information, in an attempt to stifle competition and innovation to ensure the continued success of each of the Manufacturer Defendants.  Through this conspiracy, the Manufacturer Defendants further sought to guarantee that technological breakthroughs and other innovation was limited such that no individual Manufacturer Defendant would advance too far ahead of the other Manufacturer Defendants.

5.    The Manufacturer Defendants' collusive activity was in direct conflict with their well-crafted public images, which promised customers that the Manufacturer Defendants' automobiles were the product of competitive innovation and superior German engineering.

_____

[1]    As used herein, "German Luxury Vehicles" refers to automobiles sold by the Manufacturer Defendants under the following five brands: Audi; Bentley; BMW; Mercedes-Benz; and Porsche.

6.      In furtherance of this conspiracy, the Manufacturer Defendants engaged in clandestine meetings that were typically held in working groups, each focused on specific technology or design elements.  These working group focus areas included, but were not limited to: "engine"; "chassis"; "electric/electronic"; and "total vehicle."  Through these working groups, the Manufacturer Defendants effectively acted as a single cooperative enterprise.  The coordination resulting from these collaborative working groups enabled the Manufacturer Defendants to collectively perpetuate the reputation of superior German engineering and extract a premium price for their automobiles from consumers.

7.      For example, the working groups and other collusive activity engaged in by the Manufacturer Defendants enabled one of the largest frauds ever perpetrated on consumers and regulators in the United States in which the Manufacturer Defendants jointly agreed to limit the efficacy of their diesel engine emissions systems, thereby necessitating the creation of a "defeat device" to evade United States federal and state environmental regulations.

8.      Investigations led by United States, German, and other European regulatory bodies in connection with the "defeat device" uncovered the widespread diesel engine emissions scandal and exposed the Manufacturer Defendants' long-term collusive activities.  Notably, in 2014, Daimler AG secretly alerted German and other European regulators to the existence of this conspiracy in an effort to gain leniency.  Similarly, on July 4, 2016, Volkswagen AG filed a declaration with the European Commission and the German Federal Cartel Office admitting that it had also participated in antitrust violations.

9.      As a result, sales of the Manufacturer Defendants' automobiles in the United States, its territories, and the District of Columbia occurred in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,  N.C. Gen. Stat. § 75-1, *et seq*., and state common law.

## THE PARTIES

### A. Plaintiff

10.    Plaintiff Anthony Hughes ("Plaintiff" or "Mr. Hughes"), is a North Carolina resident.   In 2013, Mr. Hughes purchased a 2014 Audi Q5 and a 2013 Audi A4 from an authorized Audi dealership in North Carolina.  In 2017, Mr. Hughes purchased a 2017 Audi Q5 from an authorized Audi dealership in North Carolina.   As detailed herein, Mr. Hughes unknowingly payed an inflated price for three new German Luxury Vehicles and was injured thereby.

### B. Defendants

*The Volkswagen Defendants*

11.    Defendant Volkswagen AG is a German corporation with its principal place of business in Wolfsburg, Germany.   Volkswagen AG, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold Volkswagen automobiles throughout the United States, including this District during the Class Period.

12.    Defendant Volkswagen Group of America, Inc. ("VW America"), a subsidiary of Volkswagen AG, is a New Jersey corporation doing business throughout the United States, with its principal place of business in Herndon, Virginia.

13.    Defendant Bentley Motors Limited ("Bentley"), a subsidiary of Volkswagen AG, is a British company doing business throughout the United States, with its principal place of business in Herndon, Virginia.

14.    Volkswagen AG, VW America, and Bentley are referred to collectively as "Volkswagen" or the "Volkswagen Defendants."

4

*The Audi Defendants*

15.     Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany.  Audi AG is a subsidiary of Volkswagen AG.  Audi AG, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold Audi automobiles throughout the United States, including this District during the Class Period.

16.     Defendant Audi of America, LLC, a subsidiary of Audi AG, is a Delaware corporation doing business throughout the United States, with its principal place of business in Herndon, Virginia.

17.     Audi AG and Audi of America, LLC are referred to collectively as "Audi" or the "Audi Defendants."

*The Porsche Defendants*

18.     Defendant Dr. Ing. h.c.F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany.  Porsche AG is a subsidiary of Volkswagen AG.  Porsche AG, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold Porsche automobiles throughout the United States, including this District during the Class Period.

19.     Defendant Porsche Cars North America, Inc., a wholly-owned subsidiary of Porsche AG, is a Delaware corporation doing business throughout the United States, with its principal place of business in Atlanta, Georgia.

20.     Porsche AG and Porsche Cars North America, Inc. are referred to collectively as "Porsche" or the "Porsche Defendants."

*The Daimler Defendants*

5

21.    Defendant Daimler AG is a German corporation headquartered in Stuttgart, Germany.  Daimler AG, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold Mercedes-Benz automobiles throughout the United States, including this District during the Class Period.

22.    Defendant Mercedes-Benz USA, LLC, a subsidiary of Daimler AG, is a Delaware corporation doing business throughout the United States, with its principal place of business in Atlanta, Georgia.

23.    Defendant Mercedes-Benz U.S. International, Inc., a subsidiary of Daimler AG, is an Alabama corporation doing business throughout the United States, with its principal place of business in Vance, Alabama.

24.    Defendant Mercedes-Benz Vans, LLC, a subsidiary of Daimler AG, is a Delaware corporation doing business throughout the United States, with its principal place of business in Ladson, South Carolina.

25.    Daimler AG, Mercedes-Benz USA, LLC, Mercedes-Benz U.S. International, Inc., and Mercedes-Benz Vans, LLC are referred to collectively as "Daimler" or the "Daimler Defendants."

***The BMW Defendants***

26.    Defendant Bayerische Motoren Werke AG ("BMW AG") is a German corporation headquartered in Munich, Germany.  BMW AG, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold BMW automobiles throughout the United States, including this District during the Class Period.

27.     Defendant BMW of North America, LLC, a subsidiary of BMW AG, is a Delaware corporation doing business throughout the United States, with its principal place of business in Woodcliff Lake, New Jersey.

28.     BMW AG and BMW of North America, LLC are referred to collectively as "BMW" or the "BMW Defendants."

*The Bosch Defendants*

29.     Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany.  Robert Bosch GmbH, directly and through its subsidiaries, distributors, and dealers, advertised, designed, developed, distributed, manufactured, promoted, and sold automobile parts and technology throughout the United States, including this District during the Class Period.

30.     Robert Bosch LLC, a subsidiary of Robert Bosch GmbH, is a Delaware corporation doing business throughout the United States, with its principal place of business in Farmington Hills, Michigan.

31.     Robert Bosch GmbH and Robert Bosch LLC are referred to collectively as "Bosch" or the "Bosch Defendants."

**C.  Agents and Co-Conspirators**

32.     Each Defendant and their respective subsidiaries acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

33.     IAV GmbH is a German engineering corporation headquartered in Berlin, Germany.  IAV GmbH, directly and through its subsidiaries and distributors, advertised, designed, developed, distributed, manufactured, promoted, and sold automobile parts and technology throughout the United States, including this District during the Class Period.

7

34.     IAV Automotive Engineering, Inc. ("IAV-AE"), a joint venture of IAV GmbH and Volkswagen AG, is a Michigan corporation doing business throughout the United States, with its principal place of business in Northville, Michigan.

35.     IAV GmbH and IAV-AE are referred to collectively as "IAV." IAV specializes in powertrain, electronic, and vehicle development and counts Volkswagen, Audi, Porsche, and Bosch as clients.

36.     IAV collaborated closely with certain of the Manufacturer Defendants and Bosch to develop software used in engine control units, and were key players in the development of the defeat devices employed by Volkswagen, Audi, and Porsche. As part of a fraud investigation by the German public prosecutor in Braunschweig, Germany, at least twenty-eight offices and private homes in Wolfsburg, Braunschweig, and Gifhorn were searched in the week of January 23, 2017. According to the German Press Agency, the raids were aimed, in part, at IAV.

## JURISDICTION AND VENUE

37.     The Court has jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to recover equitable and injunctive relief for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act.

38.     Plaintiff also asserts claims for actual and exemplary damages pursuant to certain state law, including antitrust law, unfair competition and consumer protection law, and unjust enrichment. Plaintiff seeks damages, restitution, and any other relief the Court deems appropriate against Defendants for violations of state law. Plaintiff also seeks attorneys' fees, costs, and other expenses. The Court has jurisdiction over these state claims pursuant to 28 U.S.C. § 1337.

39.     Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 12, 22, and 28 U.S.C. § 1391(b),(c), and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Defendants regularly transact business in this District.

40.     This Court has jurisdiction over Defendants because the wrongdoing alleged herein was directed at consumers in the United States, including consumers within this District.

41.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

42.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce within the United States.  German Luxury Vehicles, among other things manufactured by Defendants, are sold in the flow of interstate commerce within the United States.

43.     German Luxury Vehicles manufactured outside of the United States by Defendants and sold in the United States are goods brought into the United States for sale, and therefore, constitute import commerce.  The anticompetitive conduct, and the effects on United States commerce described herein, proximately caused antitrust injury in the United States.

44.     Defendants' unlawful activities substantially affected commerce in the United States, causing injury to Plaintiff and members of the Classes (as defined herein).  Defendants, directly and through their agents and co-conspirators, engaged in anticompetitive activities affecting each of the fifty states and the District of Columbia.

45.     Defendants' conspiracy caused persons in the United States who purchased or leased German Luxury Vehicles to pay unlawfully inflated prices.

## FACTUAL ALLEGATIONS

### A. Defendants Colluded to Limit Competition in the German Luxury Vehicle Market

46.     Beginning in the 1990s, Defendants were involved in a secret cartel to exchange competitively sensitive technical information in order to stifle competition and exact a premium price from consumers in connection with the purchase and sale of German Luxury Vehicles. Since then, Defendants and their agents have met at least 1,000 times.  Meetings among the Defendants involved employees in as many as sixty working groups, and included personnel from each Defendant.

47.     During the course of the conspiracy, Defendants shared competitively sensitive information concerning virtually all areas of automotive development, including, but not limited to: diesel engines; emission control systems; driving resistance co-efficient; convertible roofs; brake controls; transmission systems; and seat systems.

48.     Defendants effectively operated as a single enterprise by creating working groups and sometimes, sub-working groups, classified according to development area.  Working groups and sub-working groups included, among others: "engine"; "car body"; "chassis"; "electric/electronic"; and "total vehicle."  These working groups were comprised of members from various Defendants.

49.     Within their working groups, Defendants established technical standards to restrict competition and technological development to ensure that improvements in design and engineering among the Manufacturer Defendants occurred in lock-step.   Additionally, Defendants agreed to use only certain technical solutions in new vehicles.  The purpose of these rules was to ensure that none of the Manufacturer Defendants' automobiles advanced far enough ahead in terms of innovation and design that other Manufacturer Defendants would lose sales.

10

50.    Defendants were aware that their collusion was illegal. For example, a Daimler commissioned legal examination expressed "considerable concerns that problems could arise if a competitor . . . file[d] a[n] [antitrust] complaint."[2] Furthermore, in September 2011, Daimler requested that two pages of a presentation by the "Diesel Engines" working group be removed because of "serious concerns in terms of cartel law."[3]

B.  **Defendants Colluded in the Development of Emission Control Systems**

51.    On September 3, 2015, Volkswagen admitted in writing to the California Air Resources Board ("CARB") that it had deliberately designed a "defeat device" to circumvent CARB and United States Environmental Protection Agency ("EPA") emissions tests.

52.    On September 18, 2015, CARB issued an in-use compliance letter to Volkswagen related to the "defeat devices," and the EPA issued a Notice of Violation letter to Volkswagen making a similar finding of the presence of illegal "defeat devices" in Volkswagen vehicles.

53.    Following Volkswagen's disclosure to CARB and the EPA's issuance of a Notice of Violation, litigation ensued. For example, on January 4, 2016, the U.S. Department of Justice, on behalf of the EPA, filed a civil complaint in the United States District Court for the Eastern District of Michigan against Volkswagen alleging violations of the Clean Air Act in connection with Volkswagen's sale of vehicles equipped with "defeat devices."

54.    On January 11, 2017, Volkswagen agreed to plead guilty to three criminal felony counts and pay a $2.8 billion criminal penalty as a result of its "defeat device" scandal. In separate civil resolutions, Volkswagen agreed to pay $1.5 billion to settle environmental,

---

[2]    Der Spiegel Report.
[3]    *Id.*

customs, and financial claims against it, including the EPA's civil complaint alleging violation of the Clean Air Act.

55.    To date, Volkswagen has committed more than $20 billion in the United States alone related to the "defeat device" scandal to resolve claims from federal regulators, state regulators, owners of affected vehicles, and for recalls and fixes.

56.    Volkswagen's "defeat device" was not an individual act.  Instead, the origin of the development of the illegal "defeat devices" to evade U.S. and European emissions regulations began when the Manufacturer Defendants colluded to fix the size of urea tanks and injection amounts in connection with their production of automobiles equipped with diesel engines.

57.    Specifically, during the mid-2000's, as the debate over $CO_2$ emissions and global warming became more recognized, pressure mounted on car manufacturers—including the Manufacturer Defendants—to limit the $CO_2$ emissions of their automobiles.   Other car companies—most notably, Toyota—responded by developing hybrid cars which diminished fossil fuel consumption, and thus, cut $CO_2$ emissions drastically.  The Manufacturer Defendants, without comparable technology, turned to diesel engines because they emit less $CO_2$ than gasoline engines.

58.    However, diesel engines produce Nitrous Oxide ("NOX"), another air pollutant. To limit NOX emissions, the Manufacturer Defendants decided to a use a detoxifying process that injected urea—a process that had been historically used to reduce NOX emissions in commercial trucks.

59.    In 2006, the Manufacturer Defendants initiated a working group to create an emissions control system utilizing urea.  The system the working group developed—advertised as "BlueTEC" by Mercedes-Benz and "AdBlue" by Volkswagen and other Manufacturer

Defendants (together the "BlueTEC/AdBlue system")—involved injecting urea into the exhaust stream to convert NOX into nitrogen gas, water, and carbon dioxide.

60.     However, the BlueTEC/AdBlue system had several drawbacks.  First, the BlueTEC/AdBlue system was expensive.  Second, the system required the installation of a tank to hold the urea, which required regular refills in order for the process to maintain its efficacy.  Third, the urea tank occupied space in the vehicle that could otherwise be used to house other, more customer-enticing options.

61.     In April 2006, the Manufacturer Defendants met in Sindelfingen, Germany, and agreed to limit the size of urea tanks and decided that only two suppliers would produce the tanks.  Also during this period, development of the "defeat devices" was ongoing at Volkswagen.

62.      On October 19, 2006, Bosch attended a meeting with Volkswagen, Audi, BMW, and Daimler.  During the meeting, the illegal agreement to limit tank sizes in the United States was discussed.  Indeed, a Volkswagen manager's note from the meeting states, "[e]veryone wants a limit" of the amount of urea injected "because of the limited size of the urea tanks . . . [n]obody wants to report the real motivation of this limitation to the authorities (CARB, EPA)."[4]

63.     In October 2007, the Manufacturer Defendants reconvened to discuss the proper uniform urea tank size.  At this time, urea tanks ranging in size from 17 to 35 liters were considered.  However, the Manufacturer Defendants were concerned about the costs of using a larger urea tank.

64.     By 2008, the Manufacturer Defendants reached a consensus that a small urea tank would not be able to meet the new U.S. emissions standards that were to take effect in 2014.

---

[4]     Patrick McGee and Guy Chazan, *More Allegations Against WV Emerge on Car Industry Cartel*, FINANCIAL TIMES (July 28, 2017).

Accordingly, the Manufacturer Defendants agreed that to comply with the new U.S. regulations, a 19-liter urea tank with moderate urea injection was required.  The logic behind this decision was fairly simple: the larger the tank, the more urea can be injected, and the more effectively NOX can be reduced.  Additionally, a larger urea tank would require less frequent refilling.

65.    Nevertheless, in June 2010, the Manufacturer Defendants agreed to use only an 8-liter urea tank for European vehicles and a 16-liter urea tank for U.S. vehicles.  This decision was made at the Board of Directors level in a deliberate attempt to evade emissions regulations by limiting the size of urea tanks.

66.    Although the Manufacturer Defendants' vehicles struggled to meet U.S. emissions requirements, none of the Manufacturer Defendants capitalized on the obvious competitive advantage that could have been obtained by installing a larger urea tank.  Instead, the cartel held steadfast because if one of the Manufacturer Defendants installed a larger urea tank, they feared that licensing and regulatory authorities would become suspicious.  Specifically, the Manufacturer Defendants were concerned that regulatory authorities would wonder why one company's vehicles needed so much more urea to clean exhaust, while other companies supposedly managed with significantly less urea.

67.    In May 2014, Audi urgently warned the other Manufacturer Defendants not to unilaterally increase the size of urea tanks.  Specifically, Audi cautioned that such action could "expand into an arms race with regard to tank sizes, which we should continue to avoid at all costs."[5]  However, at this time, Audi was unconcerned with meeting U.S. emissions requirements

---

[5]    *Der Spiegel* Report.

because "defeat devices" ensured that their vehicles would pass inspections despite the use of an insufficiently small urea tank.

68.    Bosch was instrumental in the development of the "defeat devices," which were necessary given the insufficient urea tanks installed by the Manufacturer Defendants.  Although Bosch has publicly denied liability for calibrating the defeat devices, it paid a settlement of $327.5 million in connection with civil claims brought by U.S. buyers and dealers of Volkswagen-made diesel cars.  Bosch remains under investigation in both Germany and the United States.

69.    IAV also played a critical role in the development of "defeat devices" in Audi, Porsche, and Volkswagen vehicles.

## C.  Defendants Colluded to Stifle Other Technological Innovation

70.    Manufacturer Defendants' collusion to prevent technological innovation was not limited to emissions systems for diesel-engine vehicles.  In fact, Manufacturer Defendants conspired in virtually all areas of technological development to maximize their combined gain. Through the use of the aforementioned working groups, the Manufacturer Defendants exchanged commercially sensitive technical data to establish technical standards and agreed to install only certain technical solutions in new vehicles.  The goal of Manufacturer Defendants' conspiracy was to restrict technological developments and innovation to ensure that improvements in engineering and design occurred at a pace that benefitted all of the Manufacturer Defendants. Specifically, when one of the Manufacturer Defendants introduced a breakthrough technology, the other Manufacturer Defendants had to be capable of offering this technology relatively quickly as well.

71.    For example, on September 24, 2013, representatives from the Manufacturer Defendants met as part of the air suspension working group met to discuss supplier performance.

During this meeting, Daimler and Porsche expressed concerns about the product quality and customer service of ZF Friedrichshafen, one of the largest suppliers to the auto industry.

72.     Other working groups set a maximum speed at which convertible tops could be opened and closed, determined uniform timing of parking locks, and coordinated brake controls and seat systems.  These examples illustrate only a sliver of the cartel's collusive activities.

73.     Collusion among the Manufacturer Defendants allowed them to determine the prices at which German Luxury Vehicles would be sold.  By sharing information about costs, coordinating suppliers, and colluding on design and innovation, the Manufacturer Defendants were able to maximize the premiums paid by their customers.

D.  **Defendants Targeted U.S. Customers in Their Sales and Marketing Touting the Superior Design and Technology of German Luxury Vehicles**

74.     The collusion by the Manufacturer Defendants was in stark contrast to the public image that the Manufacturer Defendants actively promoted.  For decades, each Manufacturer Defendant has carefully targeted consumers in the United States and cultivated an image to command a premium price because of the purported superior technological innovation and engineering of German Luxury Vehicles.

75.     For example, BMW regularly highlights design and technology in their marketing campaigns to U.S. consumers.  Using phrases like, "the ultimate driving machine," and "powered by performance, design, innovation, and efficiency," BMW perpetuates the perception of superior German engineering.[6]  BMW also claims that "[a]t the heart of every BMW is advanced engineering that ensures maximum power and performance."[7]

---

[6]     *BMW i*, https://www.bmwusa.com/vehicles/bmwi.html (last visited Aug. 25, 2017).

[7]     *What Makes a BMW a BMW?*, http://www.bmwusa.com/InsideBMW.aspx (last visited Aug. 25, 2017).

76.     Similarly, Audi has marketed to customers that its vehicles are a superior product through their company motto of "Vorsprung durch Technik," or "advancement [over other companies] through technology."[8]  Audi has also used to tagline "Truth in Engineering" in its print and television advertising.[9]

77.     Porsche markets "the Porsche Principle" to customers as "the heart of everything that makes Porsche what it is."[10]  Porsche describes this principle as "to always get the most out of everything" and highlights its "Innovation," "Design," and "Performance" as embodiments of the Porsche Principle.[11]

78.     Bentley describes itself to customers as "Ever the Innovator" and claims that "[w]hen it comes to engineering and technology," Bentley is "an established pioneer."[12] Moreover, Bentley markets itself as having "continued to take giant steps forward in craftsmanship and technological innovation, setting new standards while remaining true to its heritage."[13]

---

[8]     Press Release, *50th Anniversary of the Four Rings in Ingolstadt* (Oct. 21, 1999), https://www.audi-mediacenter.com/en/press-releases/50th-anniversary-of-the-four-rings-in-ingolstadt-1194.

[9]     *Audi Celebrates 'Truth in Engineering' with New Creative Campaign Debuting This Week*, MARKETWIRED (May 13, 2013), http://www.marketwired.com/press-release/audi-celebrates-truth-in-engineering-with-new-creative-campaign-debuting-this-week-1789921.htm.

[10]    *The Porsche Principle*, http://www.porsche.com/usa/aboutporsche/principleporsche/ (last visited Aug. 25, 2017).

[11]    *Id.*

[12]    *A Technological Journey*, http://www.bentleymotors.com/en/world-of-bentley/be-extraordinary/a-technological-journey.html (last visited Aug. 25, 2017).

[13]    *Id.*

79.     Mercedes-Benz also brands itself as a superior car manufacturer under the slogan, "The best or nothing."[14]    On their website and through marketing efforts, Mercedes-Benz advertises its "Innovation," "Performance," and "Design" as differentiating characteristics.[15]    In fact, Mercedes-Benz publicizes that "Mercedes Benz is defined by its continuous innovation" and that "[s]ince inventing the car in 1886, we've simply never stopped reinventing it."[16]

E.    **Defendants Requested Permission from U.S. Regulators to Sell Vehicles**

80.     Defendants worked to entice U.S. federal regulators and certain state regulators to permit the sale of diesel-powered automobiles in the United States.    Specifically, Defendants invested substantial resources to persuade California legislators and CARB, which enforces California state emissions standards, that diesel-powered vehicles met their emissions requirements.    California emissions standards are more stringent than U.S. federal emissions standards.

81.     The Manufacturer Defendants engaged in an aggressive marketing campaign targeting CARB and U.S. federal regulators to encourage them to permit the sale of diesel-powered automobiles.    Their tactics included shipping vehicles to regulators to test drive and hosting and supporting various symposiums that extolled the benefits of "Clean Diesel."

82.     For example, in early 2006, Daimler and Volkswagen participated in two symposiums hosted by Bosch to "demonstrate the benefits of diesel . . . to environmentalists,

---

[14]     Press Release, *Mercedes-Benz Launches Communications Offensive: The Best or Nothing* (June 10, 2010), http://media.daimler.com/marsMediaSite/en/instance/ko/Mercedes-Benz-launches-communications-offensive-The-best-or-nothing.xhtml?oid=9907951.
[15]     *More than a Badge*, https://www.mbusa.com/mercedes/benz (last visited Aug. 25, 2017).
[16]     *Leading through Innovation*, https://www.mbusa.com/mercedes/benz/innovation (last visited Aug. 25, 2017).

policymakers and regulators."[17]    On January 31, 2006, Daimler, Volkswagen, and Bosch participated in a Clean Diesel "Media Ride-and-Drive," at the Irwindale Speedway, near Los Angeles, California.[18]    On February 2, 2006, the group moved north and provided a "Clean Diesel Symposium" in Sacramento, California.[19]    The Clean Diesel events promoted "the benefits of modern clean diesel technology . . . for California consumers."[20]

83.    On October 17, 2007, in San Francisco, California, Audi and the German association of automobile industry ("VDA") hosted a symposium to "promote how activities of the German automotive industry advance the development of technologies reducing CO2 emissions."[21]

84.    On October 3, 2008, BMW, Daimler, Audi, Porsche, Volkswagen, and Bosch sponsored a "Future Motion Made in Germany" symposium at the German Embassy in Washington, D.C.  The symposium discussed "the increasingly significant role that clean diesel plays in modern powertrain technologies."[22]

85.    In April 2009, Audi, BMW, Bosch, and Volkswagen participated in California "Diesel Days."  The event promoted "carbon dioxide reduction strategies for California, the

---

[17]    *Bosch      Drives      Clean      Diesel      in      California*, http://www.bosch.us/content/language1/html/734_4066.htm?section=28799C0E86C147799E022 26E942307F2 (last visited Aug. 3, 2017).

[18]    *Id.*

[19]    *Id.*

[20]    *Id.*

[21]    Press Release, *Bosch Reinforces Carbon Dioxide Reduction Technologies in California* (Oct.      2007),      http://us.bosch-press.com/tbwebdb/bosch-usa/en-US/PressText.cfm?CFID= 60473900&CFTOKEN=668b5a96345de218-7EB0CFD1-F922-A081-D4A45D6B58A5C 967&Search=1&id=321.

[22]    Press Release, *Bosch: Clean Diesel is Key Part of Future Technology Mix* (Oct. 6, 2008), http://us.bosch-press.com/tbwebdb/bosch-usa/modules/boschinfokorb.dll/presstext.pdf?db=tb webdb_us&langid=1&txtids=364&dpi=72&downloa.

latest clean vehicle technologies, and the future of clean diesel passenger vehicles."[23]  CARB and the California Energy Commission were present at the event.

86.    In December 2012, the Manufacturer Defendants, in tandem with the VDA, launched the "first ever joint promotion campaign by German automakers to promote clean diesel vehicles in the [United States]."[24]  The campaign adopted the slogan, "Clean Diesel. Clearly Better."[25]

87.    On March 28, 2013, the German American Chambers of Commerce hosted an automotive forum entitled, "Clean Diesel on the Rise," in New York, NY.  The forum was hosted in partnership with Audi, BMW, Daimler, Porsche, and Volkswagen.[26]

F.  **The Characteristics of the German Luxury Vehicle Market Enabled Collusion**

88.    By reputation, German Luxury Vehicles are considered to be among the best-engineered vehicles in the world.  Manufacturer Defendants, German Luxury Vehicle manufacturers, have relied upon and championed this perception to exact a premium price from consumers.  Indeed, the Manufacturer Defendants have consistently engaged in multi-million dollar advertising campaigns extolling the superiority of German engineering.

89.    The perceived superiority of German engineering has led to price inelasticity of German Luxury Vehicles.  When a product is "inelastic" an increase in the price of that product

---

[23]    *Propel Fuels Showcases Next Generation Green Diesel at California Diesel Days*, BUSINESSWIRE (Apr. 1, 2009).

[24]    *"Clean Diesel. Clearly Better." Campaign for Clean Diesel Cars Welcomed*, PR NEWSWIRE (Dec. 12, 2012).

[25]    *Id.*

[26]    *GACC Automotive Forum with Audi, BMW, Daimler, Porsche & VW*, GERMAN AMERICAN CHAMBERS OF COMMERCE (MAR. 28, 2013), http://www.gaccny.com/en/events/our-events/gacc-event/events/gacc-automotive-forum-with-audi-bmw-daimler-porsche-vw/.

will result only in a small decline in the quantity sold, if at all.  Consequently, the Manufacturer Defendants were able to charge a premium price without experiencing a reduction in sales.

90.    Under basic economic principles, price inelasticity should usually entice new market entrants.  However, this has not occurred in the German Luxury Vehicle industry due to its high barriers to entry.  Notably, in addition to competing with multiple established brands, any potential market entrant faces significant start-up costs, including multi-million dollar expenditures associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and customer development.

91.    As a result of the high barriers to entry, the marketplace for German Luxury Vehicles is highly concentrated.  In fact, the Manufacturer Defendants make up 100% of the German Luxury Vehicle market.

92.    The structure and characteristics of the German Luxury Vehicle industry— namely, the price inelasticity of German Luxury Vehicles, high barriers to entry of the market, and high concentration—are conductive to collusion.  Supra-competitive pricing and the lack of potential competition provides the opportunity and incentive for the Manufacturer Defendants to maximize gains from their collective monopoly over the German Luxury Vehicle industry.

G.  **Defendants' History of Illegal Activity and Collusion**

93.    Defendants' business practices have previously involved illegal and collusive activities.  In 2016, the European Commission fined Daimler and other European truck manufacturers for price-fixing.  Daimler faced the largest fine of more than €1 billion.  MAN, a subsidiary of Volkswagen, was also cited for antitrust violations, but was not fined because it revealed the existence of the cartel to regulators.

94.    As discussed above, on January 11, 2017, the U.S. Department of Justice announced that Volkswagen agreed to plead guilty to charges that the company used a "defeat-

device" to cheat on emissions tests mandated by the EPA and CARB and obstructed justice to further the scheme. As part of the agreement, Volkswagen agreed to pay $4.3 billion in criminal and civil penalties. In addition, the Department of Justice announced that a federal grand jury in the United States District Court for the Eastern District of Michigan had indicted six Volkswagen executives and employees for their roles in the "defeat-device" conspiracy.

95.     The indictments of individual Volkswagen executives for their role in evading EPA and CARB requirements, as well as other ongoing investigations into the "defeat-device" conspiracy, may provide additional information about collusion by the Defendants. For example, on July 25, 2017, Oliver Schmidt, one of the Volkswagen executives indicted by a federal grand jury in the Eastern District of Michigan, informed the judge of his intent to enter a guilty plea.

96.      On September 9, 2016, James Liang, a former engineer in Volkswagen's Diesel Development Department, entered into a plea agreement after being charged with conspiracy to defraud U.S. regulators and consumers. As a condition of his plea agreement, Liang agreed to cooperate with the government in its ongoing investigation.

97.     On July 6, 2017, Giovanni Pamio, the former head of Thermodynamics in Audi's Diesel Engine Development Department, was indicted for his role in the "defeat devices." It is unclear if Pamio is cooperating with U.S. authorities.

98.     Ongoing investigations in the European Union related to the "defeat-device" conspiracy may yield new information about Defendants' illegal collusive activities.

99.     During the week of January 23, 2017, German police raided 28 homes and offices in connection with their investigation into the diesel emissions conspiracy. Included in the raids were the home and villa of Martin Winterkorn, the former Chairman of Volkswagen AG.

100.    On March 15, 2017, in connection with the emissions cheating scandal, German police and prosecutors searched Audi headquarters in Ingolstadt, as well as offices and private residences in Baden-Wuerttemberg and Lower Saxony.  Included in the raids were the German offices of Jones Day, the American law firm Volkswagen hired to conduct an internal investigation of its emissions fraud.  Although the law firm turned over evidence to American authorities, which served as the basis for Volkswagen's guilty plea, the raid of Jones Day suggests that prosecutors believe that additional, undisclosed documents may exist.

101.    On May 23, 2017, 230 police officers and twenty-three prosecutors' representatives raided eleven Daimler locations in Germany, including Daimler's headquarters in Stuttgart.  The raids were made as part of a probe into fraud and false advertising of exhaust treatments in diesel-powered vehicles.

102.    On June 23, 2016, the German Federal Cartel Office raided offices belonging to BMW, Daimler, Volkswagen, Bosch, and ZF Friedsrichshafen, as part of an investigation into anti-competitive purchases of steel by the automotive industry.

103.    Ten days later, on July 4, 2016, Volkswagen submitted a voluntary declaration of its "participation in suspected cartel infringements" to the European Commission and the German Federal Cartel Office about the Manufacturer Defendants' decades-long collusive activities in the "development of their vehicles, costs, suppliers and markets."[27]  However, after the *Der Spiegel* Report was   published, other German media outlets have reported that Daimler was the first to come clean to German and other European antitrust regulators, and may have begun cooperating with authorities as early as 2014.

---

[27]     *Der Spiegel* Report.

## TOLLING OF THE STATUTE OF LIMITATIONS

104.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy and conduct alleged herein.  Through no fault or lack of diligence, Plaintiff and members of the Classes had no knowledge of the conspiracy alleged herein nor of facts sufficient to place them on inquiry notice until July 27, 2017, when *Der Spiegel* reported that Volkswagen disclosed its participation in the illegal conspiracy alleged herein to German and other European regulators.

105.    Plaintiff and members of the Classes assertion that they lacked the knowledge to bring forth a claim until the publication of the *Der Spiegel* article is underscored by the affirmative steps the Defendants took to conceal their conspiracy and conduct, which was fraudulently concealed by Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings at trade association meetings (and elsewhere).  Examples of Defendants' efforts to conceal their collusive arrangement includes, but is not limited to, conducting secret working groups, excluding other automotive manufacturers from their working meetings, and the Defendants' combined development of an ineffective emissions system for diesel engines which necessitated the creation of "defeat devices."

106.    The Manufacturer Defendants also deceived Plaintiff and members of the Classes by making false representations to the public about the significant competition within the German automobile industry.  For example, Dieter Zetsche, Daimler AG's Chief Executive Officer, stated that "as neighbors, we are constantly stepping on each other's toes.  In this sense,

24

competition is an incredibly good thing."[28]   Similarly, BMW AG's Chief Executive Officer,

Harald Kruger, reiterated this sentiment when he publicly stated that "[t]his competition

constantly motivates us to achieve excellence"—a remark echoed by Audi AG's Chief Executive

Officer, Rupert Stadler, when he stated that competition had "given us all a technological

advantage."[29]

107.    For these reasons, the statute of limitations as to Plaintiff's and the Classes'

claims alleged herein were tolled and suspended, and did not begin to run until, at the earliest,

July 27, 2017.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action on behalf of himself and all others similarly situated

under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).   The proposed "Nationwide

Class" consists of:

> All persons and entities who, during the Class Period, purchased or
> leased a German Luxury Vehicle in the United States, not for
> resale, which was manufactured or sold by a Defendant, any
> current or former subsidiary of a Defendant, or any co-conspirator
> of the Defendants.

109.    Plaintiff brings this action on behalf of himself and all others similarly situated

under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3).   The proposed "North Carolina

Class" consists of:

> All persons and entities who, during the Class Period, purchased or
> leased a German Luxury Vehicle in North Carolina, not for resale,
> which was manufactured or sold by a Defendant, any current or
> former subsidiary of a Defendant, or any co-conspirator of the
> Defendants.

---

[28]   *Der Spiegel* Report.

[29]   Id.

110.    The Nationwide Class and the North Carolina Class are referred to as the "Classes" throughout this Complaint.

111.    Excluded from the Classes are the Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, federal government entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities, and persons who purchased German Luxury Vehicles directly for resale.

112.    Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

113.    The Class may also be certified under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief, with respect to the Classes as a whole.

114.    Members of the Classes are so numerous and geographically dispersed that joinder of all members is impracticable.  Throughout the United States, hundreds of thousands of German Luxury Vehicles are sold each year.  The Classes are readily ascertainable from corporate information and records.

115.    Plaintiff's claims are typical of the claims of other members of the Classes. Plaintiff and all other members of the Classes were damaged by the same wrongful conduct of the Defendants—*i.e.*, as a result of Defendants' misconduct, Plaintiff and other members of the Classes paid artificially inflated prices to purchase or lease German Luxury Vehicles.

116.    Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the other members of the Classes.

117.    Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including vehicle defect litigation and antitrust litigation. Plaintiff's counsel will fairly, adequately, and vigorously protection the interests of the Classes.

118.    There are questions of law and fact common to all members of the Classes, including but not limited to the following:

    a.    Whether Defendants and their co-conspirators engaged in a scheme to artificially inflate the price of German Luxury Vehicles sold and leased in the United States;

    b.    The identity of the participants of the alleged conspiracy and their roles in implementing the scheme;

    c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    d.    Whether the alleged conspiracy and conduct violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and/or N.C. Gen. Stat. § 75-1, *et seq*.;

    e.    Whether the conduct of the Defendants and their co-conspirators caused injury to the business or property of Plaintiff and members of the Classes;

    f.    Whether Plaintiff and members of the Classes paid artificially inflated prices for German Luxury Vehicles purchased and leased in the United States during the Class Period;

g. Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the members of the Classes;

h. The appropriate injunctive and related equitable relief; and

i. The appropriate class-wide measure of damages for the Classes.

119.    Questions of law and fact common to members of the Classes predominate over questions that may affect individual members of the Classes because the Defendants acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

120.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

121.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## ANTITRUST INJURY

122.    Defendants' anticompetitive conduct had the following effects, among others:

a. Price competition has been restrained or eliminated with respect to German Luxury Vehicles;

b. The prices of German Luxury Vehicles have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.  Indirect purchasers of German Luxury Vehicles have been deprived of free and open competition; and

d.  End-user consumers of German Luxury Vehicles who indirectly purchased German Luxury Vehicles for personal use, including Plaintiff, paid artificially inflated prices.

123.  The German Luxury Vehicles that Plaintiff and members of the Classes purchased or leased were in substantially the same form as when they were initially sold by Defendants. As a result, the German Luxury Vehicles follow a traceable physical chain from Defendants to the Plaintiff and members of the Classes, and the overcharge on German Luxury Vehicles can be traced from Defendants to Plaintiff and members of the Classes.

124.  As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers in the form of higher retail prices. For a firm to be a profitable valid concern, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass through rate. As a general matter, the pass through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for German Luxury Vehicles), the pass-through rate to end users is at or near 100 percent.

125.  Consequently, while the direct purchasers were the first to pay supra-competitive prices, all or most of the overcharge was passed along the distribution chain and absorbed by Plaintiff and members of the Classes when they purchased the German Luxury Vehicles.

126.    Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to end-user consumers.  Thus, the economic harm to Plaintiff and members of the Classes can be quantified.

127.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of German Luxury Vehicles and, as a direct and foreseeable result, Plaintiff and members of the Classes paid supra-competitive prices for German Luxury Vehicles during the Class Period.

128.    By reason of the alleged violations of antitrust laws, Plaintiff and the Classes have sustained injury to their businesses or property, having paid higher prices for German Luxury Vehicles than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result have suffered damages.

129.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## COUNTS

### FIRST CLAIM FOR RELIEF
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(on behalf of Plaintiff and the Nationwide Class)**

130.    Plaintiff incorporates and realleges, as though fully set forth herein, the allegations in each of the preceding paragraphs.

131.    Defendants and unnamed co-conspirators entered into a contract, combination, and conspiracy in unreasonable restraint of trade which had the effect of artificially fixing, raising, maintaining, and stabilizing prices for German Luxury Vehicles in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

132.    Defendants' anticompetitive acts were intentionally directed at the United States market for German Luxury Vehicles, and had a direct, substantial, and foreseeable effect on interstate commerce by artificially fixing, raising, maintaining, and stabilizing prices on German Luxury Vehicles throughout the United States.

133.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers and lessees in the Nationwide Class who purchased or leased German Luxury Vehicles from Defendants, Defendants' current and former subsidiaries, and Defendants' co-conspirators have been harmed by being forced to pay inflated prices for German Luxury Vehicles.

134.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

135.    Defendants' conspiracy had the following effects, among others:

    a.    Price competition in the United States market for German Luxury Vehicles has been restrained, suppressed, and/or eliminated;

    b.    Prices for German Luxury Vehicles sold and leased by Defendants, Defendants' current and former subsidiaries, and Defendants' co-conspirators in the United States have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels; and

    c.    Plaintiff and members of the Nationwide Class who purchased or leased German Luxury Vehicles indirectly in the United States from Defendants,

Defendants' current and former subsidiaries, and Defendants' co-conspirators have been deprived the benefits of free and open competition.

136.    Plaintiff and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for German Luxury Vehicles purchased or leased indirectly in the United States from Defendants, Defendants' current and former subsidiaries, and Defendants' co-conspirators than they would have paid and will pay in the absence of the conspiracy.

137.    The alleged contract, combination, and conspiracy is a *per se* violation of the Sherman Act.

138.    Plaintiff and members of the Nationwide Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiff and the Nationwide Class)

139.    Plaintiff incorporates and realleges, as though fully set forth herein, the allegations in paragraphs 1 through 129.

140.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on the sale and lease of German Luxury Vehicles.

141.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from overpayments for German Luxury Vehicles made by Plaintiff and members of the Nationwide Class.

142.    Plaintiff and members of the Nationwide Class conferred a monetary benefit upon Defendants in the form of payment for the purchase or lease of German Luxury Vehicles.

143.    Defendants had knowledge of the benefits conferred directly upon themselves by Plaintiff and members of the Nationwide Class.

144.    Plaintiff and members of the Nationwide Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiff and members of the Nationwide Class are entitled to the establishment of a construct trust consisting of all ill-gotten gains from which Plaintiff and members of the Nationwide Class may make claims on a pro rata basis.

### THIRD CLAIM FOR RELIEF
#### Violation of N.C. Gen. Stat. § 75-1, *et seq.*
#### (on behalf of Plaintiff and the North Carolina Class)

145.    Plaintiff incorporates and realleges, as though fully set forth herein, the allegations in paragraphs 1 through 129.

146.    Defendants and unnamed co-conspirators knowingly and expressly entered into a contract, combination, and conspiracy in restraint of trade or commerce which had the effect of artificially fixing, raising, maintaining, and stabilizing prices for German Luxury Vehicles in the State of North Carolina.

147.    Defendants' anticompetitive acts were intentionally directed at the North Carolina market for German Luxury Vehicles, and had a direct, substantial, and foreseeable effect on trade and commerce by artificially fixing, raising, maintaining, and stabilizing prices on German Luxury Vehicles.

148.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the German Luxury Vehicle market for the purpose of

affecting competition and controlling, fixing, or maintaining prices of German Luxury Vehicles in the State of North Carolina.

149.    Defendants' unlawful conduct substantially affected competition, trade, and commerce in the German Luxury Vehicle market in the State of North Carolina.

150.    Defendants engaged in unfair and deceptive practices within the State of North Carolina.

151.    Defendants' conduct is and has been immoral, unethical, oppressive, unscrupulous, substantially injurious to consumers, and offensive to established public policy.

152.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiff and members of the North Carolina Class.

153.    As a result of Defendants' unlawful conduct, Plaintiff and members of the North Carolina Class were harmed and suffered actual injury as a proximate result of Defendants' unfair and deceptive practices by being forced to pay inflated prices for German Luxury Vehicles.

154.    Plaintiff and members of the North Carolina Class have been injured and will continue to be injured in their business and property by paying more for German Luxury Vehicles purchased or leased indirectly from Defendants in North Carolina, Defendants' current and former subsidiaries, and Defendants' co-conspirators than they would have paid and will pay in the absence of the conspiracy.

155.    Defendants' unlawful conduct in violation of N.C. Gen. Stat. § 75-1.1 was willful and intentional.

156.    Plaintiff and members of the North Carolina Class are entitled to seek treble damages pursuant to N.C. Gen. Stat. § 75-16, and an award of attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of himself and the proposed Nationwide Class and North Carolina Class, respectfully demands that this Court:

A.     Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Classes, and declare Plaintiff as the representative of the Classes;

B.     Enter judgment against Defendants and in favor of Plaintiff and the Classes;

C.     Award the Classes damages, including treble damages where applicable, in an amount to be determined at trial;

D.     Permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claim to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.     Award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

F.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of himself and the proposed Nationwide Class and North Carolina Class, demands a trial by jury on all issues so triable.

Dated: August 31, 2017

**CARELLA BYRNE CECCHI**
**OLSTEIN BRODY & AGNELLO, PC**

By: */s/ James E. Cecchi*
    James E. Cecchi

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

Joseph H. Meltzer
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: jmeltzer@ktmc.com
      tziegler@ktmc.com

*Attorneys for Plaintiff and the Proposed Classes*